IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLLE
November 26, 2002 Session

## STATE OF TENNESSEE v. JOSEPH B. THOMPSON

**Appeal from the Criminal Court for Sullivan County**
**No. S42,926      R. Jerry Beck, Judge**

_____

**No. E2002-00061-CCA-R3-CD**
**March 17, 2003**
_____

The defendant, Joseph B. Thompson, was convicted of aggravated robbery and aggravated kidnapping. The trial court imposed consecutive sentences of twenty years for each offense for an effective sentence of forty years. In this appeal of right, the defendant asserts (1) that the trial court erred by denying his motion for judgment of acquittal; (2) that his convictions for both aggravated robbery and aggravated kidnapping violate the rule established in State v. Anthony; (3) that a pretrial photographic array was unduly suggestive; (4) that the trial court erred by the admission of photographs of the victim; (5) that the trial court erred by denying his motion for mistrial; (6) that the offenses should have been severed for trial; (7) that the trial court erred by refusing to dismiss the indictment when the state failed to disclose exculpatory information; (8) that the trial court erred by admitting a receipt that was not properly authenticated; (9) that the trial court impermissibly limited closing argument to forty minutes; and (10) that the sentence is excessive. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Raymond C. Conkin, Jr., Kingsport, Tennessee, for the appellant, Joseph B. Thompson.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; and B. Todd Martin, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

During the early morning hours of June 20, 1999, the sixty-two-year-old victim, Shirley Huffman, a desk clerk at the Microtel motel in Kingsport, was attacked and beaten by a man wearing a ski mask. The victim, who suffered injuries to her head and face, felt the sensation of being dragged before she lost consciousness. When she briefly regained consciousness, she realized that she was in the restroom adjacent to the manager's office.

Robin Lynette Blix, also a desk clerk at the motel, testified that the defendant, whom she recognized as an acquaintance of her ex-boyfriend, entered the lobby of the motel through the front door just before midnight. According to Ms. Blix, the defendant left the lobby before the victim, who began her shift at midnight, arrived for work. She recalled that the victim had locked all of the motel's exterior doors shortly after her arrival. Ms. Blix remembered that the defendant had been a guest at the Microtel several days earlier, but was not registered on the night of the robbery.

Alicia Hendrickson, general manager of the Microtel, explained that key cards issued to guests were programmed to open both the individual guest rooms and the exterior doors. She explained that each key card could be used until a new key was created with the same room number. Ms. Hendrickson, who attended the same high school as the defendant, recalled that he was a guest at the motel from June 5 through June 12, and still owed more than $200 for his lodging. She testified that when the defendant checked into the motel on June 5, he paid for one day and made arrangements to pay for the balance of his stay when he received his paycheck. Ms. Hendrickson explained that she had made a similar arrangement with the defendant on an earlier occasion and that he had paid the full balance. After being notified of the robbery, Ms. Hendrickson went to the motel and gave the defendant's name to police based upon the description of the perpetrator provided by other witnesses. Ms. Hendrickson testified that more than $400 was missing after the robbery.

Robert Wayne Hughes, who was training as a reserve deputy for the Sullivan County Sheriff's Department at the time of the offenses, testified that he and his girlfriend, Suzanne Faye Lawson, arrived in separate cars at the Microtel between 1:00 and 1:30 a.m. As Hughes drove closer to the entrance of the motel, he saw a masked black male, who was wearing dark brown clothing, lurking in a hallway near the lobby. According to Hughes, the individual retreated into the hallway after seeing him outside. Hughes then directed Ms. Lawson to follow him to an adjacent parking lot so that they could not be seen from the lobby. Afterward, Hughes drove back toward the lobby and walked to the call box to summon an attendant. After the victim allowed him into the lobby, Hughes checked the hallway near the lobby to see if anyone was there. He stated that when he informed the victim that he had seen a man lurking near the lobby, she did not seem concerned, apparently believing that the individual was a registered guest.

Suzanne Faye Lawson, Hughes' girlfriend, testified that she observed an individual, whom she later identified as the defendant, drive a car from the rear parking lot of the motel, park, and then walk toward her vehicle. Ms. Lawson stated that she saw the defendant's face as he walked within ten feet of her car. She described the defendant as wearing dark gray clothing and having black hair, a medium complexion, and a slim build. Later, she saw the defendant enter a back door of the motel. Ms. Lawson remembered that when she informed Hughes that she had seen the defendant enter through the back door, Hughes checked the floors and then called the front desk to tell the clerk of the defendant's presence. After the robbery, Ms. Lawson identified the defendant from a photographic lineup as the individual she had seen enter the motel.

James Alexander Bardinelli and Joel Dingus, employees of a Kroger located adjacent to the Microtel, were standing outside their place of business sometime between 2:00 and 2:15 a.m. They

were approached by the defendant, who offered to sell them some sporting tickets. Bardinelli, who identified the defendant from a photographic lineup, recalled that he and his brother had seen the defendant the day before. Dingus saw the defendant drive into the parking lot of the Microtel and enter through a back door.

At 2:39 a.m., Sergeant Dan Brookshire and Officer Mark Osterman of the Kingsport Police Department responded to the silent alarm at the Microtel. Upon their arrival, the front door was locked and there was no clerk located in the desk area. After someone inside opened the door, Officer Osterman examined the front desk area while Sergeant Brookshire stayed in the lobby. Sergeant Brookshire observed a screwdriver stuck in the doorjamb of the restroom located adjacent to the front desk. Officer Osterman, who had seen a large amount of blood on the floor behind the front desk and on the restroom door, was unable to open the restroom door because the screwdriver had been lodged between the door and the frame. When the screwdriver was removed, the officers discovered that the door was locked. After gaining entry by the use of a knife, officers discovered the victim, who was badly injured and lying in a pool of blood.

Detective Penny Kindle of the Kingsport Police Department testified that she interviewed the victim at Wellmont Hospital on the day following the crimes. She took several photographs which depicted the various injuries the victim had suffered during the attack. After the defendant's arrest, Detective Kindle noticed that defendant's right hand was swollen.

Mary Kay Arnold, who was dating the defendant at the time of the offenses, testified that the defendant was at her residence until 10:00 p.m. on the day before the robbery. She recalled that he was wearing blue jeans and a red tee shirt when he left. According to Ms. Arnold, the defendant returned shortly after 3:00 a.m. the following morning. Awakened by the sound of running water in her kitchen sink, she walked downstairs and heard the defendant say, "Do not come into the kitchen." According to Ms. Arnold, the defendant was wearing the same clothing he had on earlier in the evening. She noticed that his right hand was swollen. She testified that the defendant then left the residence and, when he returned shortly after sunrise, he was wearing a yellow shirt, yellow hat, and blue jeans and was carrying a Proffitt's bag. The defendant handed her a pair of brown suede boots and asked her to discard them. According to Ms. Arnold, the boots had dark red or brown stains on the toe area. She recalled that the defendant asked her to drive to the Laundromat, where he dumped clothing from a black plastic bag into a washing machine. Ms. Arnold testified that she did not see the clothing that had been in the bag and conceded that she had originally lied to the police regarding the defendant's whereabouts on the night of the offenses. She explained that she "was scared because [she] had thrown away some boots and my friend told me that he might have been the one."

Officer David Quillen testified that the defendant asked to speak with him on the day after the robbery. According to Officer Quillen, the defendant initially denied any involvement, claiming that he had been living in his car and was asleep at the time. Eventually, the defendant acknowledged that he had been at the Microtel prior to the robbery. When Officer Quillen noticed that the defendant's right hand was badly swollen, the defendant explained that he had hit someone

but refused to identify the individual. The officer stated that the defendant at first denied committing the robbery but later qualified his claim, pointing out that "no person saw [him] commit any crime."

Dr. Joann D'Aprile Lukes, who treated the victim, testified that there was a three-centimeter laceration on the victim's left eyebrow, a five-centimeter laceration on her left ear, a one-centimeter scalp laceration, and a one-centimeter laceration on her left middle finger. She described the victim as having extensive swelling on the right side of her face. Her right eye was swollen shut, her lips were swollen, and her entire facial area was black and blue.

Dr. Timothy A. Urbin, a neuropsychologist, observed severe injuries to both sides of the front part of the victim's brain and lesser injuries to the right side of the back part of her brain. He diagnosed the victim with a concussion and Post-Traumatic Stress Disorder. It was his opinion that the victim would experience difficulties with her thought processes for the remainder of her life.

The victim, sixty-five-year-old Shirley Huffman, recalled that just prior to the attack, a guest warned her that he had seen a man lurking in the lobby. As a result, she removed $200 from the cash drawer behind the front desk and placed it in the safe. Later, just after the same guest telephoned the front desk to tell her that he had seen someone on the second floor of the motel, a light-skinned black male appeared in the lobby, jumped over the counter, and began to beat her with his right fist, eventually threatening to shoot her. The victim testified that she struggled to reach the alarm button but was not sure if it was activated because she eventually lost consciousness. She recalled that when she regained consciousness, she realized that she was on the floor of the restroom and was able to lock the door from the inside. The victim was unable to identify the defendant's face because he wore a ski mask during the attack, but otherwise described him as only slightly taller than her.

Karen N. Lanning, an agent with the FBI, testified for the defense. Ms. Lanning, an expert in the field of fiber and hair analysis, stated that she had examined a number of hairs collected from inside the defendant's vehicle and determined that none of them belonged to the victim. She also examined hairs found on the victim and concluded that they were not those of the defendant. Ms. Lanning stated that if the perpetrator were wearing a mask, gloves, a long-sleeve shirt, pants, and boots, she would not expect to find his hair at the crime scene.

Three forensic scientists with the TBI testified for the defense. Hoyt Phillips testified that he compared two latent fingerprints and one palm print found at the scene with the known prints of the defendant and determined that the prints found at the scene were not those of the defendant. Joe Minor testified that he examined the accelerator pedal and brake pedal from the defendant's car and concluded that there was no blood on either. He also found no blood on the floor mats from the defendant's car. Minor stated that no blood was found on the six pairs of the defendant's shoes that were tested. Linda Littlejohn compared the defendant's shoes with impressions left at the scene and determined that none of the shoes tested matched the impression.

# I

As his first issue, the defendant asserts that the trial court erred by refusing to grant a motion for judgment of acquittal based on the insufficiency of the evidence. He argues that the evidence was insufficient to establish his identity as the perpetrator.

> Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows: The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(a).

This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. Overturf v. State, 571 S.W.2d 837 (Tenn. 1978). At the point the motion is made, the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. Hill v. State, 4 Tenn. Crim. App. 325, 470 S.W.2d 853 (1971). When the motion for acquittal is made at the conclusion of the state's evidence and is not granted, the defendant "may offer evidence without having reserved the right." Tenn. R. App. P. 29(a).

When considering a sufficiency question on appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Where the evidence is circumstantial in nature, the jury must find that the proof is not only consistent with the guilt of the accused but inconsistent with his innocence. There must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypothesis except that of guilt. Pruitt v. State, 3 Tenn. Crim. App. 256, 460 S.W.2d 385, 390 (1970). The trial court has the duty to charge the jury on the weight and significance of circumstantial evidence when it is the only basis upon which the state's case rests. Bishop v. State, 199 Tenn. 428, 287 S.W.2d 49, 52 (1956). Like all other fact questions, the determination of whether all reasonable theories or

hypotheses are excluded by the evidence is primarily a jury question. State v. Tharpe, 726 S.W.2d 896 (Tenn. 1987); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958).

The jury is governed by four rules when testing the value of circumstantial evidence: (1) The evidence should be acted upon with caution; (2) all of the essential facts must be consistent with the hypothesis of guilt; (3) the facts must exclude every other reasonable theory except that of guilt; and (4) the facts must establish such a certainty of guilt as to convince beyond a reasonable doubt that the defendant is the perpetrator of the crime. Marable, 313 S.W.2d at 456.

The defendant asserts that because witnesses for the state disagreed about the color of the clothing that the perpetrator wore, the state failed to prove that he was, in fact, the person who committed the crimes. He also states that Dingus' credibility was questionable because certain of the testimony he provided at trial was in conflict with that he provided at the preliminary hearing. Issues of identity and credibility are classic jury questions.

The defendant, a light-skinned black male, admitted to police that he had been at the Microtel on the evening of the crimes. Testimony from Ms. Blix and Ms. Hendrickson established that the defendant had been a guest at the motel in the days before the crimes and that he possessed a key card which gave him access to the exterior doors of the motel. Dingus and Ms. Lawson testified that they saw the defendant enter the motel just before the commission of the crimes. Hughes described seeing a black male "lurking" in the hallway near the lobby after the motel's exterior doors had been locked. Ms. Arnold testified that the defendant asked her to dispose of his boots, which had red or brown stains on the toe. After his arrest, the defendant's hand was swollen and he admitted striking another individual. When questioned by police, the defendant, while not admitting to the crimes, simply stated that no one saw him commit the offenses. The jury accredited the testimony of the state's witnesses, as was its prerogative. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). In our view, the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that the defendant committed the crimes.

**II**

The defendant claims that because the victim locked the restroom door after being dragged inside by the perpetrator, the state failed to prove that "the movement or confinement was beyond that necessary to consummate the act of the accompanying offense," as required by State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). Thus, he argues, his conviction for aggravated kidnapping should be set aside. See id. The state asserts that because the defendant placed a screwdriver in the doorjamb, preventing the victim's escape, the confinement was more than that incidental to the aggravated robbery.

In Anthony, our supreme court acknowledged that a period of confinement of the victim frequently accompanies such crimes as robbery and rape and established that whether a separate kidnapping conviction can be supported depends upon "whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony." 817 S.W.2d at 305. In State v. Dixon, our high court clarified its ruling in Anthony:

<u>Anthony</u> and its progeny, however, are not meant to provide the rapist a free kidnapping merely because he also committed rape. The <u>Anthony</u> decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping.

957 S.W.2d 532, 534-35 (Tenn. 1997). Where the confinement is beyond that necessary for the accompanying felony, the next inquiry is whether it (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. <u>Id.</u> at 535.

Here, the victim testified that she was beaten and then dragged into the restroom. Although she could not recall how the door came to be closed, the victim recalled locking the door from the inside to protect herself. Sergeant Brookshire testified that when he arrived to investigate, he had to remove the screwdriver from the doorjamb to gain entrance into the restroom. Implicit in his testimony is that the door could not have been opened so long as the screwdriver remained in place. Medical and other testimony established that the victim was severely injured, drifting in and out of consciousness while in the restroom. It is our view that the placement of the screwdriver in the doorjamb prevented the victim from seeking help, increased her risk of harm, and reduced the defendant's risk of detection. In consequence, the evidence was sufficient to support convictions for both aggravated robbery and aggravated kidnapping.

**III**

The defendant next contends that the photographic array from which Ms. Lawson identified him was impermissibly suggestive because he is the only light-skinned black male in the array. The state responds that because the height, weight, age, and facial characteristics of the individuals in the lineup were similar, it was not unduly suggestive.

To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification. <u>Simmons v. United States</u>, 390 U.S. 377 (1968). Where the identification procedure is unduly suggestive, the totality of the circumstances surrounding the identification must be examined to determine whether the identification is nevertheless sufficiently reliable to satisfy due process. <u>See</u> <u>Neil v. Biggers</u>, 409 U.S. 188 (1972). In <u>Biggers</u>, the Supreme Court ruled that the following factors should be examined to determine whether the procedure was too suggestive to accept as reliable:

(1) the opportunity of the witness to view the criminal at the time of the offense;
(2) the witness' degree of attention;
(3) the accuracy of the witness' prior description of the individual;
(4) the level of certainty demonstrated by the witness at the confrontation; and
(5) the time between the crime and the confrontation.

Id. at 199.

The trial court denied the defendant's pretrial motion to suppress the eyewitness identifications. When the trial court makes a finding of facts at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings are binding upon this court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also Stephenson, 878 S.W.2d at 544; State v. Goforth, 678 S.W.2d 477, 479 (Tenn. Crim. App. 1984). Questions of credibility of witnesses, the weight and value of the evidence, and resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. Odom, 928 S.W.2d at 23. Where, as here, the suppression of the evidence in question does not involve issues of credibility, our standard of review is de novo without a presumption of correctness. See State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). The evidence involved in this issue is the photographic array itself, which involves no issue of credibility and which this court is just as capable of reviewing as the trial court. See id.

Ms. Lawson testified that she had ample opportunity to observe the defendant in the parking lot of the Microtel. She stated that her attention was concentrated on the defendant as he walked by her car. She identified the defendant as the perpetrator only hours after the crimes and she was certain of her identification. While the defendant has the lightest complexion of all of the individuals included in the lineup, the other physical characteristics are quite similar. This court has held that "a lineup would be considered unduly suggestive . . . when the other participants were grossly dissimilar." State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing United States v. Wade, 388 U.S. 218, 233 (1967)). There is no such gross dissimilarity here. Where the lineups are not unduly suggestive, it is not necessary to proceed to the next step in the analysis and determine whether the identification is nevertheless reliable. See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990); State v. Mosley, 667 S.W.2d 767, 770 (Tenn. Crim. App. 1983). The defendant is not entitled to relief on this issue.

**IV**

As his next issue, the defendant asserts that the trial court erred by admitting various photographs of the victim which were taken after the robbery. He argues that some of the photographs should have been excluded because their probative value was outweighed by the danger of unfair prejudice and that others should have been excluded as cumulative. See Tenn. R. Evid. 403. In response, the state submits that the trial court did not abuse its discretion in the admission of the photographs because the photographs were relevant to show the extent of the victim's injuries.

The admissibility of photographs is governed by Tennessee Rule of Evidence 403. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). The evidence must be relevant and its probative value must outweigh any prejudicial effect. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed

-8-

absent a clear showing of an abuse of that discretion. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Here, the state sought admission of fourteen different photographs depicting the victim's injuries both before and after she received medical treatment. The trial court excluded two photographs, concluding that because of their gruesome nature, the danger for unfair prejudice outweighed their probative value. The trial court admitted the remainder of the photographs after determining that they were particularly relevant to prove the severity of the victim's injuries, an element of the offense of aggravated robbery, and that their probative value was not outweighed by the danger of unfair prejudice.

Of those photographs admitted, exhibits 52 thru 57 show the bloody wounds to the victim's face and head before the blood was cleaned away at the hospital. While unpleasant, they are probative of the serious nature of the injuries suffered by the victim. Exhibits 61 thru 63 depict the same injuries after they had been cleaned. Both sets of photographs would be admissible as indicative of the ferocity of the assault. The trial court, however, should have excluded photographs which depicted the same injuries both before and after treatment due to their cumulative nature. See Tenn. R. Evid. 403. In the context of the entire trial, however, any error in the admission of the photographs would qualify as harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). Exhibits 64 thru 72 depict injuries that the victim received to other parts of her body including her chest, neck, and hands. These photographs are not particularly graphic and are probative to show the extent of her injuries. In our view, the probative value of these photographs is not outweighed by the danger of unfair prejudice.

## V

The defendant next complains that the trial court erred by refusing to grant a mistrial after Ms. Arnold, his ex-girlfriend, testified that someone told her that the defendant might have been the person who robbed the Microtel. The state asserts that the curative instruction provided by the trial court immediately after the offending testimony was sufficient to cure any error.

"The entry of a mistrial is appropriate when the trial cannot continue for some reason, or if the trial does continue, a miscarriage of justice will occur." State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court, and this court will not disturb the trial court's determination unless a clear abuse of discretion appears on the record. Id.

In this instance, Ms. Arnold testified that she had originally lied to police regarding the defendant's whereabouts on the night of the offenses. She explained that she "was scared because [she] had thrown away some boots and [her] friend had told [her] that [the defendant] might have been the one." The trial court overruled the defendant's objection, concluding that the statement was not hearsay because it was not offered to prove the truth of the matter asserted. It then instructed the jury as follows:

So, you will not consider what the alleged friend allegedly said for the truth of what the friend said because it would be hearsay -- but I am going to allow you to hear what the friend said for the purpose of explaining why this witness either took or didn't take an action.

So, it's for very limited purposes only. Not for the truth of what the friend said but only for the purpose of showing why she did what -- it's up to you to determine why she did it. That's a jury question. But only for that limited purpose of why she may have done something or not done something.

The credibility, believability, you're the judges of each witness that testifies. I have no opinion in it.

When asked to explain why she was fearful, Ms. Arnold responded, "Because one of my friends had told me that [the defendant] could have been the one to rob the Microtel." The defendant again objected, and the trial court sustained the objection. The trial court instructed the jury to disregard the second statement and confirmed that each juror would disregard the testimony.

In context, Ms. Arnold's comments were an attempt to explain why she had initially failed to report the defendant's suspicious activities to the police. The trial court properly instructed the jury that it could consider her testimony only for that purpose. See Tenn. R. Evid. 801, 802 (out-of-court statements offered to prove the truth of the matter asserted are not admissible). This court must presume that the jury followed the instruction. See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994); State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). Thus, there was no abuse of discretion in denying a mistrial. See State v. Hall, 976 S.W.2d 121 app. at 147-48 (Tenn. 1998) (holding that trial court's curative instruction negated need for mistrial).

## VI

Next, the defendant challenges the trial court's denial of his motion to sever the aggravated robbery and aggravated kidnapping charges from the theft of services and theft under $500 charges. Initially, the theft under $500 charge was dismissed by the state. The defendant was acquitted by the jury of the theft of services charge, which was based upon his failure to pay for his lodging at the Microtel in the days preceding the crimes. The trial court denied the motion to sever, concluding that the theft of services charge was "inextricably" connected to the other charges. The defendant asserts that the theft of services charge is completely unrelated to the aggravated robbery and aggravated kidnapping of the victim and that the evidence of that crime affected the guilty verdicts. The state submits that the three offenses are part of a common scheme or plan because it was the defendant's earlier stay that provided him with the key card he later used to gain access to the locked exterior door of the Microtel.

"[D]ecisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). Additionally, "a trial court's refusal to sever offenses will be reversed only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an

injustice to the party complaining.'" Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Rule 14 (b)(1) provides as follows:

> If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

Tenn. R. Crim. P. 14(b)(1). The "primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of indictment had been severed." State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984). "In its most basic sense, therefore, any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000) (quoting State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999)); see also Shirley, 6 S.W.3d at 248.

Tennessee Rule of Evidence 404(b) prohibits the admission of "other crimes, wrongs, or acts" of the defendant when admitted only to show the defendant's propensity to commit the crime charged. See Tenn. R. Evid. 404(b). Rule 404(b) does not, however, bar the admission of acts alleged to be part of a common scheme or plan when relevant to a material issue at trial. See Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). Before a trial court may deny a severance request, it must hold a hearing on the motion and conclude from the evidence and argument presented at the hearing that (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant. Spicer, 12 S.W.3d at 445; see also Tenn. R. Evid. 404(b)(3).

"[A] common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." Moore, 6 S.W.3d at 239 n.7. Three types of common scheme or plan evidence are recognized in Tennessee: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. This court ruled in State v. Hallock that:

> [T]he mere existence of a common scheme or plan is not a proper justification for admitting evidence of other crimes. Rather, admission of evidence of other crimes which tends to show a common scheme or plan is proper to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue.

-11-

875 S.W.2d 285, 292 (Tenn. Crim. App. 1994).

In this instance, the defendant stayed at the Microtel in the days before the robbery but failed to pay for his lodging, resulting in the theft of services charge. That the defendant, in this case, had been a guest at the Microtel, entitled him to a key card which permitted after-hours access to the exterior doors of the motel. In our view, that evidence would be relevant to show how he was able to gain entry into the locked motel on the night of the robbery. Because identity was an issue, evidence of his registration was probative as to those state witnesses who identified the defendant based upon that earlier stay. The fact that he failed to pay for the lodging during his previous stay would not, however, be relevant to the aggravated robbery and aggravated kidnapping charges. Because our supreme court has emphasized that propensity evidence should be avoided, proof of the theft of services charge most likely should not have been admitted at the trial of the greater charges. A severance of the theft of services charge would have been in order.

Our next inquiry is whether the error more probably than not affected the outcome of the trial. See Moore, 6 S.W.3d at 242 (holding that "[b]ecause the question of whether to grant a severance under Tennessee Rule of Criminal Procedure 14(b)(1) is primarily an evidentiary question . . . the effect of a denial of that right is weighed by the same standard as other non-constitutional evidentiary errors"). Here, Dingus and Ms. Lawson testified that they saw the defendant enter the motel just before the commission of the crimes. Hughes described seeing a black male "lurking" in the hallway near the lobby after the motel's exterior doors had been locked. Ms. Arnold, whose testimony was particularly damaging to the defendant, testified that the defendant left her residence at 10:00 p.m. and returned before sunrise the next morning. When he returned, he asked her to dispose of his boots, which had red or brown stains on the toe. After his arrest, the defendant's hand was swollen and he admitted striking another individual. When questioned by police, the defendant, while not admitting to the crimes, simply stated that no one saw him commit the offenses. Further, the jury acquitted the defendant of the theft of services count. In Moore, our supreme court included in its harmless error analysis that "the jury did not consider the [improperly joined] offense as propensity evidence because the jury . . . acquitted the appellant on this count." Id. Even though the evidence of the defendant's guilt as to the aggravated robbery and aggravated kidnapping was primarily circumstantial, the state's case was strong. The error would qualify as harmless, having had no effect on the verdict. See Tenn. R. App. P. 52(a); Tenn. R. Crim. P. 36(b).

**VII**

As his next issue, the defendant asserts that the trial court should have dismissed the charges because the state failed to disclose exculpatory information in violation of the rule established in Brady v. Maryland, 373 U.S. 83 (1963). He specifically complains that the state failed to timely inform him that Officer Osterman had overheard a conversation at the crime scene wherein a white male stated "it wasn't . . . 'Jo-Jo'" in the parking lot.

In Brady, the United States Supreme Court held that the prosecution has a compelling duty to furnish the accused with exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. Id. at 87. Exculpatory evidence under Brady

includes information or statements of witnesses which are favorable to the accused. See, e.g., State v. Goodman, 643 S.W.2d 375, 379-80 (Tenn. Crim. App. 1982). Moreover, exculpatory evidence under Brady includes information which can be used only for impeachment purposes. See Giglio v. United States, 405 U.S. 150, 154-55 (1972); Workman v. State, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993). Failure to reveal exculpatory evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady, 373 U.S. at 87. In order to determine the materiality of undisclosed information, the reviewing court must ascertain whether "in [the] absence [of the information] [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419 (1995); see also State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). Thus, in order to prove a Brady violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Edgin, 902 S.W.2d at 390.

Before a reviewing court may find a due process violation under Brady, four prerequisites must be satisfied:

> (1) The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> (2) the State must have suppressed the information;
> (3) the information must have been favorable to the accused; and
> (4) the information must have been material.

Id. The defendant bears the burden of demonstrating the elements of this claim by a preponderance of the evidence. See Smith v. State, 757 S.W.2d 14, 19 (Tenn. Crim. App. 1988). "The Brady rule does not require a prosecutor to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive him of a fair trial." State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995).

Officer Osterman, who arrived at the Microtel shortly after Sergeant Brookshire, testified that it was his duty to make sure that no one entered the crime scene while the police were conducting the investigation. He stated that he otherwise took no significant part in the actual investigation of the case. While standing near the lobby area of the motel, Officer Osterman noticed four white males standing near the hallway. He heard one of the men say "the only black man I know is 'Jo-Jo' and it wasn't 'Jo-Jo.'" At the time Officer Osterman heard the statement, he had not been informed that the defendant was a suspect. Some twenty months later, Officer Osterman, during an interview by the assistant district attorney, for the first time recalled his knowledge of the conversation. The state immediately informed the defendant of the statement and the trial court granted a six-month continuance so that the defendant could investigate its origin.

In this instance, the information does not fall within the rule of Brady because the information, although delayed, was disclosed. See United States v. Bencs, 28 F.3d 555, 561 (6th Cir.

1994).  Brady only applies to a complete failure to disclose exculpatory information and does not apply to delayed disclosure unless the delay itself causes prejudice.  See generally United States v. Word, 806 F.2d 658, 665 (6th Cir. 1986).  Because disclosure was delayed and not denied, the defendant must demonstrate prejudice in order to qualify for relief.  The trial court granted a lengthy continuance so that the defendant could attempt to locate the individual who made the comment.  Although the defendant was unable to find the potential witness, the record does not establish that the inability to locate the witness was the result of the delayed disclosure.  Officer Osterman was unable to provide a description, other than the fact that he was white, making it unlikely that an earlier disclosure would have assisted the defendant in identifying the individual.  In our view, the defendant has failed to demonstrate that he was prejudiced by the delayed disclosure of this statement.

In a related issue, the defendant argues that the trial court should have permitted Officer Osterman to testify regarding the statement that he overheard.  It is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion.  State v. Campbell, 904 S.W.2d 608, 616 (Tenn. 1995); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989); see also Tenn. R. Evid. 104.

The Rules of Evidence provide that "hearsay is not admissible except as provided by these rules or otherwise by law."  Tenn. R. Evid. 802.  Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  A statement by an unknown individual that the defendant, who was apparently referred to as "Jo-Jo," was not in the lobby of the Microtel at the time of the offense would qualify as hearsay.  The defendant has failed to establish any exception which would permit its admission.  Under these circumstances, the trial court did not abuse its discretion.

## VIII

The defendant also complains that the trial court erred by admitting into evidence a Montgomery Ward department store return receipt that the victim discovered among her belongings.  According to the defendant, the state failed to properly authenticate his signature on the receipt.  The state responds that because the receipt is self-authenticating as an inscription affixed in the course of business, no further authentication was necessary.

Tennessee Rule of Evidence 901 provides, in pertinent part, as follows:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what the proponent claims.

Tenn. R. Evid. 901(a).  Rule 902 provides that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required" for "[i]nscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control or origin."  Tenn. R. Evid. 902(7).  Utilizing this rule, the Montgomery Ward receipt, bearing the retailer's name and other

relevant information, affixed during the course of business, would not require extrinsic evidence of its authenticity as a prerequisite to admission. See State v. Reid, 41 S.W.3d 247, 296 (Tenn. 2002) (holding that cash register receipts qualify as an "inscription" under Rule 902(7)).

The defendant's signature on the receipt, however, presents a separate question. With regard to the authenticity of handwriting, Rule 901 provides that "[n]on-expert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation" will satisfy the authentication requirement. Tenn. R. Evid. 901(b). The receipt at issue was not a receipt for a credit card purchase, which might contain the name of the cardholder; it was a receipt for a cash exchange signed by "J. Thompson." There was no testimony that the writing was what it purported to be, the signature of the defendant; thus, the state failed to properly authenticate the signature as required by Rule 901. Because authentication is a prerequisite to admissibility, the signature portion of the receipt should have been excluded. Further, without the signature, the receipt becomes irrelevant because it cannot be tied to either the crime or the defendant. See Tenn. R. Evid. 401. Examining the trial as a whole, however, it is our view that any error in the admission of the receipt would qualify as harmless, having no effect on the verdict. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## IX

The defendant next contends that the trial court erred by limiting closing argument to forty minutes per side. The state disagrees. Initially, the defendant originally agreed to a time limit of thirty minutes and did not pose a contemporaneous objection when the time was extended to only forty minutes. Generally speaking, appellate relief will not be granted "to a party responsible for an error or who failed to take whatever action was reasonably necessary to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a); see State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993).

Moreover, the defendant is not entitled to relief on the merits of the issue. Tennessee Rule of Criminal Procedure 29.1(c) provides that "the order and length of arguments shall be in the sound discretion of the trial judge, who shall allow adequate but not excessive time for the full presentation of the theory of the case." The defendant, who had originally agreed to a thirty-minute time limit, later requested forty-five minutes for his final argument. The trial court determined that forty minutes per side was sufficient given the nature and complexity of the case. The defendant has failed to establish that the trial court's ruling qualifies as an abuse of discretion.

## X

Finally, the defendant asserts that his sentence is excessive. He specifically complains that the trial court erred by imposing the maximum sentence for each count and by ordering that the sentences be served consecutively. The state asserts that the sentence is proper.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon

the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If the trial court's findings of fact are adequately supported by the record, this court may not modify the sentence even if it would have preferred a different result. State v. Fletcher, 805 S.W.2d 785 (Tenn. Crim. App. 1991). The presumption of correctness is, however, "conditioned upon the affirmative showing in the record that the trial court considered sentencing principles and relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The trial court must place on the record the reasons for the sentence. State v. Jones, 883 S.W.2d 597 (Tenn. 1994).

In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

In imposing an effective sentence of forty years, the trial court first determined that the defendant qualified as a Range II, multiple offender and then applied the following enhancement factors to both convictions:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
(4) the victim was particularly vulnerable because of age;
(8) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and
(13) the felony was committed while the defendant was on probation.

Tenn. Code Ann. § 40-35-114(1), (4), (8), and (13) (1997). The trial court also applied enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high, to the conviction for aggravated kidnapping. Tenn. Code Ann. § 40-35-114(10) (1997). The trial court determined that there were no mitigating factors applicable to either conviction. See generally Tenn. Code Ann. § 40-35-113.

The sentence range for both offenses, Class B felonies, was twelve to twenty years. See Tenn. Code Ann. §§ 39-13-304(b)(1), 39-13-402(b), 40-35-112(b)(2). The defendant concedes the applicability of each of the enhancement factors as well as the absence of mitigating factors, but argues that the enhancement factors were not sufficient to warrant the maximum sentence for each count. The weight to be afforded an existing factor is left to the sentencing court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). The weight to be afforded mitigating and enhancement factors derives from balancing relative degrees of culpability within the totality of the circumstances of the case involved. Id. at 476; see also State v. Marshall, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993). Based upon the presence of five enhancement factors and the absence of mitigating factors, it is our view that the imposition of 20-year sentences, the maximum within the range, was justified.

The defendant also claims that the trial court erred by imposing consecutive sentences. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227, 230 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[1] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

---

[1] The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

-17-

(2) the defendant is an offender whose record of criminal activity is extensive;

(3) the defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) the defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual physical and mental damage to the victim or victims;

(6) the defendant is sentenced for an offense committed while on probation; or

(7) the defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

In imposing consecutive sentences, the trial court determined that the defendant is an offender whose record of criminal activity is extensive and that the defendant was on probation when he committed the crimes. See Tenn. Code Ann. § 40-35-115(b)(2), (6). The trial court also determined that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and who has no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(4).

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." 905 S.W.2d at 938.

Here, the trial court considered the factors in <u>Wilkerson</u> and concluded that consecutive sentencing was necessary to protect the public from the defendant and that the resulting term, forty years, was reasonably related to the severity of the offenses. The trial court placed particular emphasis on the violent nature of the offenses and on the severity of the injuries that the victim suffered. The record establishes that the defendant has an extensive criminal record, that he committed the offenses while on probation, and that he qualified as a dangerous offender. In our view, the trial court did not err by ordering consecutive sentences.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE