**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald BENCS, Defendant–Appellant.**

No. 93–3408.

United States Court of Appeals,
Sixth Circuit.

Argued May 2, 1994.

Decided June 30, 1994.

Linda M. Betzer, Asst. U.S. Atty., Stephen G. Sozio, Asst. U.S. Atty. (argued and briefed), Cleveland, OH, for plaintiff-appellee.

Harvey H. Starkoff, Richard A.F. Mendelsohn (argued and briefed), Cleveland, OH, for defendant-appellant.

Before: KEITH and SUHRHEINRICH, Circuit Judges; and JOINER, Senior District Judge.[*]

JOINER, Senior District Judge.

Ronald Bencs was charged with conspiring to defraud the United States, evading income tax, money laundering, and structuring financial transactions to avoid cash reporting requirements applicable to transactions in excess of $10,000. The government claimed generally that Bencs was involved in a large marijuana selling business, and attempted to shelter his drug profits from taxes and hide them from detection. The jury convicted on all counts, and Bencs appeals all but his conspiracy conviction, raising numerous claims of error. We conclude that the structuring charges (counts 16 and 17) were submitted to the jury under erroneous instructions, and reverse those convictions and remand for a new trial. In all other respects we affirm.

## I.

### A.

In 1988, the IRS criminal investigation unit investigated Bencs' accountant, Robert Gross, for allegedly helping a drug dealer launder drug proceeds and evade income tax on those proceeds. Agents searched Gross' office in April 1988, and, among other documents, seized the financial records of Ronald Bencs and his company, Diversified Financial Enterprises.

In reviewing those records, IRS agents Cappara and Kacarab noted that Bencs' net worth was approximately $1.2 million, but that his reported income did not justify this accumulation of wealth. The agents researched public records, bank records and tax returns, and interviewed a number of people, including Bencs, to account for the discrepancy. Bencs told the agents that Diversified's business was, in fact, diversified, and that the company had sources of income from striping parking lots; selling jewelry, art work and Christmas trees; and renovating houses. Bencs also claimed nontaxable sources of income in the form of loans from various individuals and banks. Bencs denied receiving income from illegal activities.

Contrary to Bencs' denial, the investigation indicated that Bencs was involved in a large marijuana distribution operation. Raymond Russell testified that he started selling marijuana to Bencs in 1972, and sold 300 to 500 pounds per month to him in 1973 and 1974. Russell testified that he sold 9000 pounds of marijuana for Bencs between 1980 and approximately 1985. Bencs occasionally bought cocaine from Russell during this period in amounts of one-half to one kilogram at a time. Russell's activity for the years 1985–89 abated somewhat. He testified that during this four-year period, he sold marijuana to Bencs on two occasions, one involving 40 pounds and one involving 60 pounds. Russell also borrowed $16,000 from Bencs to buy cocaine and repaid Bencs in 1986 or 1987 with 500 pounds of marijuana.

Michael McCarthy testified that from 1974 to 1976 he transported Russell's marijuana from Arizona, delivering it to Bencs in Cleveland. McCarthy testified that his dealings with Bencs resumed in 1983 and continued to

[*] The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

1985, when he again transported marijuana to Bencs, delivering 200–300 pounds on each trip. He and Bencs each made a profit of $100 per pound. Finally, George Abraham testified that between 1974 and 1983 he sold marijuana to Bencs in 200–300 pound amounts. These transactions took place at varying intervals, as seldom as once very six months and as frequently as two times per week.

Bencs formed Diversified in 1978, naming himself president. Bencs was the sole shareholder, and Gross maintained the financial records. Kacarab analyzed the deposits to and checks written against Diversified's account for the years 1983–88, demonstrating at trial that a total of $376,460.28 in cash was deposited, and only $41,680 in checks. Most of these checks were from individuals, or were government checks endorsed by the individuals to Diversified. A total of $318,374 was disbursed from the account in payroll checks to Bencs. Kacarab testified that a payroll check was usually negotiated shortly after a cash deposit was made. Diversified's bank records and tax returns did not reflect expenses customarily incurred by businesses engaged in sales and contracting work, such as cost of goods sold, rent, utilities, and labor. Diversified's tax returns reflected losses for all years but one, when it reported a $241 gain.

Cappara and Kacarab undertook a net worth analysis of Bencs and his company, necessitated because Bencs transacted business almost exclusively in cash and had records inadequate to determine his tax liability. The agents calculated Bencs' net worth at the end of 1983, and then for each of the years that followed through 1988. Included in the net worth computation were known income; personal, nondeductible expenditures for which documentation existed; bank account balances; real property; vehicles; securities; and other assets, such as loan receivables and an interest in a partnership. After subtracting liabilities, the agents then calculated Bencs' net worth for each tax year in question. The agents concluded that Bencs' net worth for the years 1984–88 exceeded his reported income in amounts ranging between $68,000 and $99,000, and that he had underpaid income tax for those years in amounts ranging between $21,000 and $40,000. Bencs presented an expert witness at trial who concurred in Kacarab's methodology and used most of his calculations. The expert's totals differed principally because he included Bencs' alleged ownership of coins, Krugerrands and jewelry in calculating Bencs' net worth as of the end of 1983, valuing them at $200,000.

### B.

Bencs and Gross were charged with conspiring during the years 1978–89 to defraud the United States through obstructing the collection of tax on income earned from the illegal sale of controlled substances, 18 U.S.C. § 371 (count 1). Bencs was charged with five counts of income tax evasion for the years 1984–88, 26 U.S.C. § 7201 (counts 2–6). Gross was charged with four counts of filing false tax returns for the years 1985–88, 26 U.S.C. § 7206(2) (counts 7–10). Bencs and Gross were charged with five instances of laundering drug proceeds as payroll in 1987 and 1988, 18 U.S.C. § 1956(a)(1)(B)(i) (counts 11–15). Finally, Bencs was charged with two instances of structuring financial transactions to avoid the cash transaction reporting requirements, 31 U.S.C. § 5322 (counts 16–17). Gross pled guilty to two counts of the indictment, and did not testify at trial. Bencs went to trial and was convicted on all counts. He was sentenced to 65 months imprisonment. No appeal is taken from the sentence.

### II.

### A. Denial of Motion to Suppress

■ Bencs moved to suppress the statements that he made to agents Cappara and Kacarab during the interview at his home, on grounds that he was not advised of his *Miranda*[1] rights prior to the interview. The court conducted an evidentiary hearing and concluded that the motion was without merit. We review findings of fact in connection with a motion to suppress for clear error, and review the district court's conclusions of law

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

de novo. *United States v. Duncan,* 918 F.2d 647, 650 (6th Cir.1990), *cert. denied,* 500 U.S. 933, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991).

■ The agents testified that they displayed their credentials to Bencs when they arrived at his home, informed him that they were conducting a criminal investigation, and advised him of his constitutional rights. Douglas Noe was in the house during this interview, but the agents testified that he was not present when they advised Bencs of his rights. Nonetheless, Noe testified that he heard the agents identify themselves and ask Bencs if he would answer some questions. Noe confirmed that Bencs was complying of his own free will and that the agents did not display weapons or restrict Bencs' movement. However, both Bencs and Noe denied that the agents informed Bencs of his rights. This alleged omission formed the basis for Bencs' motion to suppress. On appeal, Bencs does not argue that *Miranda* warnings were constitutionally required because he was "in custody"; rather, he suggests that the interview was a noncustodial one in which warnings were required, allegedly because the failure to give the warnings violated IRS procedure.

■ The suppression of evidence does not depend on whether agents violate internal operating procedures, but on whether those procedures are required by either the Constitution or federal law. *United States v. Caceres,* 440 U.S. 741, 749–55, 99 S.Ct. 1465, 1470–73, 59 L.Ed.2d 733 (1979). *Miranda* prohibits the use of unwarned statements made by a defendant "stemming from custodial interrogation[.]" *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). *Accord Stansbury v. California,* — U.S. —, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Beckwith v. United States,* 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976) (holding that statements made during noncustodial interview with IRS agent need not be suppressed and confirming that determinative issue is whether suspect is in custody, not whether he is focus of

investigation).[2] The interview of Bencs was not a custodial interview, and *Miranda* warnings were not required. *United States v. Sivils,* 960 F.2d 587, 597–98 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992). The district court properly denied Bencs' motion to suppress.

### B. Denial of Motion to Bifurcate and Motion for Mistrial

■ Bencs claims that the court erred in denying his motion to bifurcate the tax evasion charges from the money laundering charges, stating that his defense on the evasion charges was prejudiced by evidence admissible only on the laundering charges, i.e., that he had income derived from illegal activity. He claims that the prejudice is apparent from the government's reference to his drug dealing in its opening statement. Bencs' motion for a mistrial based on these comments was denied, and he claims that this too was error.

Offenses may be joined under Fed. R.Crim.P. 8(a) if they are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Rule 14 provides that if joinder of offenses results in prejudice, "the court may order an election or separate trials of counts … or provide whatever other relief justice requires." Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district court. *Zafiro v. United States,* — U.S. —, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

Joinder of the money laundering and tax evasion counts was proper. Evidence of Bencs' marijuana income was admissible on the evasion charges regardless of whether Bencs was simultaneously tried on the money laundering charges. The charge of tax evasion requires proof of the willful attempt to evade or defeat a federal tax. 26 U.S.C. § 7201. The government may prove tax eva-

---

**2.** *Beckwith* acknowledged that suppression of statements derived from noncustodial interrogation might be warranted if the interrogators behaved in a coercive manner, overbearing the

suspect's will. 425 U.S. at 347–48, 96 S.Ct. at 1616–17. Facts suggesting coercion simply are not present in this case.

sion through the net worth method, pursuant to which the government demonstrates with reasonable certainty the defendant's net worth at the commencement of the relevant period, and then at the end. If the ending amount is greater than the beginning, and the government proves beyond a reasonable doubt that the defendant had one or more sources of taxable income, the jury can find that the receipts constituted taxable income to the defendant. *Holland v. United States,* 348 U.S. 121, 138, 75 S.Ct. 127, 136–37, 99 L.Ed. 150 (1954). Drug proceeds constitute taxable income. Thus, in *United States v. Wirsing,* 719 F.2d 859 (6th Cir.1983), the court concluded that tax evasion charges were properly joined with a marijuana distribution charge, where the defendant's unreported income was allegedly derived from his illegal activity in distributing drugs.[3] *Accord United States v. Clark,* 928 F.2d 639, 644 (4th Cir.1991).

The evidence which Bencs claims was prejudicial was admissible against him on both the evasion charges and laundering charges, and the government was entitled to make reference to this evidence in its opening statement. Consequently, Bencs has not demonstrated that the district court erred in denying his motion to bifurcate or his motion for a mistrial.

## C. *Brady* Material

■ Bencs contends that he was denied a fair trial by virtue of the government's delayed production of material allegedly discoverable under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). Specifically, he challenges the government's failure to respond to a *pre* trial discovery request by producing memoranda

of interviews with witnesses Abraham and McCarthy. The Abraham memoranda were produced two days prior to trial; the McCarthy memorandum was produced during trial, but prior to McCarthy's testimony. The memoranda contained statements by both witnesses to the effect that Bencs was not involved in drug dealing, inconsistent with the witnesses' trial testimony.[4] Additionally, the Abraham memoranda reflected that Abraham informed the agents that Bencs sold jewelry and collected coins, a statement that Bencs contends was relevant to his attack on the government's net worth analysis, as discussed in more detail below. Finally, Bencs complains that the memorandum of interview of witness Russell, and his grand jury testimony, were not produced until shortly before trial.

■ " '[T]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one[.]' " *United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir.1994) (quoting *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845–46, 51 L.Ed.2d 30 (1977)). However, *Brady* imposes on the government an obligation to turn over material that is both favorable to the defendant and material to guilt or punishment. Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial. *United States v. Agurs,* 427 U.S. 97, 112 n. 20, 96 S.Ct. 2392, 2401 n. 20, 49 L.Ed.2d 342 (1976).[5] Reversal for a *Brady* violation is required only where there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. *Mullins,* 22 F.3d at 1371. Thus, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose. *United States v. Word,* 806 F.2d

---

**3.** The court nonetheless concluded that severance of the drug charge should have been granted because defense counsel had insufficient time to prepare for trial on the evasion charges. *Wirsing,* 719 F.2d at 864–66.

**4.** Abraham first told the agents that Bencs was not involved in drug transactions, but returned the next day to correct that statement, informing the agents at that time that Bencs bought hundreds of pounds of marijuana from him through

1984. Both statements were provided to Bencs prior to trial.

**5.** ' The Supreme Court rejected the claim that the duty to disclose hinges on the usefulness of the material to pretrial preparation. Such a standard would "necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense." *Agurs,* 427 U.S. at 112 n. 20, 96 S.Ct. at 240 n. 20.

658, 665 (6th Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1383, 94 L.Ed.2d 697 (1987). "Delay only violates *Brady* when the delay itself causes prejudice." *United States v. Patrick,* 965 F.2d 1390, 1400 (6th Cir.1992), *vacated and remanded on other grounds,* — U.S. ——, 113 S.Ct. 1378, 122 L.Ed.2d 754 (1993).

■ When *Brady* material sought by a defendant is covered by the Jencks Act, 18 U.S.C. § 3500,[6] the terms of that Act govern the timing of the government's disclosure. *United States v. Presser,* 844 F.2d 1275 (6th Cir.1988) (Jencks Act overrides *Brady* with respect to timing of disclosure; evidence properly disclosed after testimony at trial pursuant to Jencks Act cannot be subject to earlier disclosure under *Brady* ). *Presser* discounted the likelihood that a defendant could be prejudiced by the production of witness statements during trial, as permitted by the Jencks Act, noting that even the *Brady* doctrine requires only the production of material in time for its effective use at trial.

> Any prejudice the defendant may suffer as a result of disclosure of the impeachment evidence during trial can be *eliminated by the trial court ordering a recess in the proceedings in order to allow the defendant time to examine the material and decide how to use it.*

*Id.* at 1283–84 (emphasis added).

However Bencs' claim is analyzed, whether as seeking true *Brady* material or witness statements subject to the Jencks Act, it is evident that he has no cognizable claim of error or prejudice. The evidence requested by Bencs *was* produced, and only the timing of the disclosure is at issue. Bencs claims that his trial preparation was hindered by virtue of the production of the evidence during trial, and, without explanation or exemplification, that his cross-examination of the witnesses was not as effective as it otherwise would have been. The first claim is not cognizable under *Agurs,* and the second lacks any substance whatsoever. Bencs' *Brady* claim of error has no merit.

## D. Sufficiency of the Evidence

Bencs contends that the evidence of money laundering and tax evasion was insufficient to support the jury's verdicts. We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

### 1. Money Laundering

■ Counts 11 through 15 charged five instances in 1987 and 1988 of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[7] The amounts involved totalled $12,830 in 1987 and $17,100 in 1988. The charges set forth the elements of a § 1956(a)(1)(B)(i) offense in alleging that Gross issued checks drawn against Diversified's account to Bencs and that Bencs negotiated the checks; that the transactions involved the proceeds of drug sales, as Bencs knew; and, finally, that Bencs acted knowing that the transaction was designed to conceal or disguise the nature and source of the proceeds. *United States v. Moss,* 9 F.3d 543, 551 (6th Cir.1993).

6. "In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500.

7. Section 1956(a)(1)(B)(i) provides:
(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a finan-

cial transaction which in fact involves the proceeds of specified unlawful activity—
. . . .
(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
. . . .
shall be sentenced to a fine of not more than $500,000 or twice the value of the property . . . imprisonment for not more than twenty years, or both.

Bencs claims that the record reflects "significant sources of income" during 1987 and 1988, and does not reflect that he was engaged in drug dealing during this time. Based on this view of the record, Bencs contends that the evidence of laundering was insufficient as a matter of law. We disagree.

The government proved that Bencs was involved in a substantial drug selling operation that had lasted over 15 years. The government further proved that Bencs created Diversified midway into his operation, funding it almost entirely with cash deposits (over $376,000 since 1983), and extracting from it periodic "payroll" payments (totalling over $318,000 since 1983). The record reflects that deposits in excess of $68,000 were made to Diversified's account in 1987, and $35,000 in 1988. There was no evidence substantiating Bencs' claim that Diversified was engaged in legitimate income-generating activity in these amounts. Bencs' expert acknowledged that the proceeds of stock dividends and sales and the sales of real property were not treated as corporate income, and income from rental property was reported by Bencs as personal income.[8]

Bencs' argument is based on the assumption that the government must trace the funds involved in a financial transaction to specific drug sales in order to successfully prove a money laundering charge. Bencs was charged with laundering the proceeds of his own drug selling business. Section 1956(a)(1)(B)(i) requires only that the defendant conduct a financial transaction "involving" the proceeds of specified unlawful activity.

We do not read Congress's use of the word "involve" as imposing the requirement that the government trace the origin of all funds deposited into a bank account to determine exactly which funds were used for what transaction. Moreover, we cannot believe that Congress intended that

participants in unlawful activities could prevent their own convictions under the money laundering statute simply by commingling funds derived from both "specified unlawful activities" and other activities.

*United States v. Jackson*, 935 F.2d 832, 840 (7th Cir.1991). Like the Seventh Circuit, we refuse to read the statute in a manner that would reward the more creative money-launderer by allowing him to escape liability altogether by commingling assets or otherwise disguising the source of his funds.

On the record presented, a rational juror could have found each element of the offense beyond a reasonable doubt. We therefore affirm Bencs' laundering convictions.

## 2. Tax Evasion

Section 7201 provides that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall ... be guilty of a felony[.]" 26 U.S.C. § 7201. The government may prove tax evasion through the net worth method, pursuant to which a taxpayer's net worth is calculated at the beginning of the relevant period and then at the end. The difference between these two amounts may be attributed to taxable income if the government proves that the taxpayer had one or more sources of taxable income. *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

In approving the net worth method in *Holland*, the Court cautioned that the method is "so fraught with danger for the innocent that the courts must closely scrutinize its use." *Id.* at 125, 75 S.Ct. at 130. Thus, "an essential condition ... is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the

---

**8.** All of these facts distinguish this case from *United States v. McDougald*, 990 F.2d 259 (6th Cir.1993) (holding government did not prove that defendant *knowingly* laundered a third person's drug proceeds, where government introduced no evidence of the third person's sources of income and where evidence of defendant's knowledge of source of money was as consistent with innocence as with guilt; and implying in that kind of case that government must trace the allegedly laundered money to specific unlawful activity). In *McDougald*, the defendant was charged with laundering another person's drug proceeds, and the government failed to demonstrate that the defendant knew the source of the allegedly laundered money. In this case, Bencs is charged with laundering the proceeds of his own drug activity.

taxpayer's assets." *Id.* at 132, 75 S.Ct. at 134. A defense often asserted in net worth cases is that the government's opening net worth is not accurate because of substantial cash or assets on hand at the starting point. This "favorite defense," as characterized by the Supreme Court, is one which the government has great difficulty refuting. *Id.* at 127, 75 S.Ct. at 131. Nonetheless, the government's failure to investigate leads furnished by the taxpayer can result in serious injustice. "When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury." *Id.* at 136, 75 S.Ct. at 135.

▮ Net worth increases must be attributable to taxable income. However, where the government proves a source of taxable income, it need not negate all the possible nontaxable sources of the alleged net worth increases, such as gifts, loans, and inheritances. Proof of a source of taxable income carries with it the negation of untaxable income. *Id.* at 137–38, 75 S.Ct. at 136–37.

Bencs attacks the legitimacy of the government's net worth analysis by claiming that the government's starting figure for the end of 1983 was too low, because it did not take into account an alleged coin, Krugerrand and jewelry collection. Bencs also claims that the agents did not pursue leads furnished by him and did not fully investigate his financial status as of the end of 1983. The agents testified, however, that they researched Bencs' financial statements and tax returns. None substantiated Bencs' ownership or acquisition *in 1983* of a coin collection, and none reflected a sale of such items after that date. Although a number of Bencs' witnesses claimed to have seen his coin collection, none verified that the collection existed as of the beginning of the net worth period. The agents also interviewed Bencs' alleged jewelry source, and learned that Bencs had pur-

chased a total of 25 pieces over a ten-year period, at a cost of only $5000 per year.

The jury properly was left to decide whether Bencs owned those assets at the end of 1983. Based on this record, a rational trier of fact could conclude that Bencs' opening net worth was that which the government proved, and not Bencs' inflated figure. *United States v. Carpenter,* No. 88–2190, 1989 WL 140188 at * 3, 1989 U.S.App. LEXIS 17588 at *9 (6th Cir. Nov. 21, 1989) (per curiam) ("Evidently, the jury simply did not believe the appellant's story that his wife had amassed a $200,000 fortune over the preceding years and keeping the money in a box in the closet."). *United States v. Wilson,* 647 F.2d 534, 536 n. 1 (5th Cir.1981) (holding that jury could decide question of credibility regarding defendant's cash hoard).

▮ Bencs also contends that the evidence in support of his tax evasion convictions is insufficient because the testimony at trial did not reflect the same volume of drug sales for 1987 and 1988 as had existed in prior years. The government's financial proof reflected that Bencs had underreported his income by $69,000 and $68,000 for the years 1987 and 1988. The government also proved that Bencs had a source of taxable income during this period—drug dealing. Bencs himself claims to have had other sources of taxable income. It was not necessary, as Bencs concedes, for the government to prove that all of the unreported income was illegally derived. Having proved a likely source of taxable income, the government was not required to negate all possible sources of untaxable income. *Holland,* 348 U.S. at 137–38, 75 S.Ct. at 136–37. Even now, Bencs does not contend that *non* taxable income explains the entire amount of unreported income.[9]

The evidence, when viewed in the light most favorable to the government, was sufficient to support the jury's guilty verdicts on all of the tax evasion charges, including those

---

9. One of Bencs' witnesses testified that he loaned Bencs $50,000 in October 1987 to enable Bencs to meet a margin call following the stock market decline, testimony that the jury was free to credit or disregard. Even if the jury were to credit this testimony, however, a conviction for that tax year would not be precluded. The government is

not required to prove the exact amount of unreported income and resulting tax deficiency, but only that the amount of tax evaded was substantial. *United States v. Sorrentino,* 726 F.2d 876, 880 n. 1 (1st Cir.1984); *Brodella v. United States,* 184 F.2d 823, 826 (6th Cir.1950).

for 1987 and 1988. We therefore affirm his convictions on those charges.

### E. Jury Instructions

#### 1. Leads Instruction

■ Bencs contends that the court erred in refusing his requested instructions that the government is "duty bound to follow up leads presented to them," and that the government's "failure to do so may be seen as a complete defense to a prosecution based upon net worth analysis." (Defendant's requested instructions 33A and 62B.) "[W]hen a theory of defense finds some support in the evidence and in the law, a defendant is entitled to some mention of that theory in the instructions." *United States v. Garner*, 529 F.2d 962, 970 (6th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2630, 49 L.Ed.2d 376, 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 124 (1976). However, a "party is not entitled to an instruction on his theory of the case if that party does not produce sufficient evidence of such theory." *United States v. Carpenter*, No. 88–2190, 1989 WL 140188 at * 3, 1989 U.S.App. LEXIS 17588 at *9–*10 (6th Cir. 1989) (per curiam) (defendant not entitled to instruction that government failed to pursue leads resulting in incorrect net worth).

The court's "leads" instruction adequately informed the jury that they were entitled to take into account the government's response to reasonable leads furnished by the defendant. On this record, Bencs was entitled to no more. While we do not foreclose the possibility that instructions approximating those requested by Bencs might be warranted in the proper case, we find no error in the court's refusal of Bencs' request on the record presented.

#### 2. Structuring Instruction

■ Bencs was charged with structuring financial transactions to avoid the reporting requirements applicable to cash transactions in excess of $10,000, in violation of 31 U.S.C. § 5322. In *Ratzlaf v. United States*, ——

U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), decided after this case was tried, the Supreme Court held that the government must prove that a defendant charged with a structuring offense acted with knowledge that the structuring he undertook was unlawful, not simply that the defendant's purpose was to circumvent a bank's reporting obligation. Bencs requested a jury instruction containing both elements, but the court instructed the jury that the government "need not prove, however, that the Defendant knew that structuring a transaction as alleged was against the law." The record does not reflect that Bencs objected to this instruction. Nonetheless, in light of *Ratzlaf,* we conclude that the district court's jury instruction constitutes plain error. *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We therefore reverse Bencs' convictions on counts 16 and 17, and remand for a new trial as to those counts.[10]

### F. Other Claims of Error

We have carefully reviewed Bencs' claims that the district court erred in allowing the government to ask leading questions, refusing to admit his father's tax returns, permitting cross-examination of a defense witness, and permitting the government to exceed the scope of cross-examination in its rebuttal examination of an IRS agent. We find no abuse of discretion in any of these evidentiary rulings. Further, we have reviewed Bencs' claim that he was denied discovery by virtue of the government's failure to produce a copy of the audit of his 1979 tax return, conducted eight years before the criminal investigation was undertaken. Based upon the testimony of the IRS custodian of records, destruction of those documents commenced in January 1987. There is no evidence that the government failed to produce documents in existence, or wrongfully procured the destruction of evidence. Bencs' claim of error has no merit.

For the reasons stated, we **REVERSE** Bencs' convictions on counts 16 and 17, charging violations of 31 U.S.C. § 5322, and

---

**10.** Reversal of Bencs' conviction on these counts renders moot his argument that he was prejudiced by the delayed disclosure that agents Cap-

para and Kacarab were to testify that Bencs admitted to them that he was aware of the cash transaction reporting requirements.

**REMAND** for a new trial on these charges. In all other respects, we **AFFIRM** Bencs' convictions.