**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 12a0363n.06**

**No. 09-4098**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
APR 4, 2012
LEONARD GREEN, Clerk

DAVID G. THORNE,                                )
                                                )
    Petitioner-Appellant,                       )
                                                )
                                                )    ON APPEAL FROM THE
    v.                                          )    UNITED STATES DISTRICT
                                                )    COURT FOR THE
DEB TIMMERMAN-COOPER, WARDEN,                   )    NORTHERN DISTRICT OF
                                                )    OHIO
    Respondent-Appellee.                        )
                                                )
                                                )

BEFORE:  CLAY, ROGERS, and DONALD, Circuit Judges.

**ROGERS, Circuit Judge.** Petitioner David Thorne appeals the denial of his § 2254 habeas petition, which challenged his conviction for aggravated murder. Following a five-day trial, Thorne was convicted and sentenced to life in prison for hiring a man named Wilkes to kill Thorne's ex-girlfriend so that Thorne could have custody of their son. On appeal, Thorne argues that the district court erred in rejecting his various *Brady* claims regarding evidence that another person was near the murder scene after the murder and that police at one point had other leads in their investigation. Thorne also contends that he was denied effective assistance of trial counsel because his counsel failed to hire a blood spatter expert, and failed to uncover discrepancies between crime scene photos and Wilkes's confession. However, because Thorne cannot demonstrate that the evidence suppressed by the State was both exculpatory and material, he cannot succeed on his *Brady* claims.

1

As for his ineffective assistance of counsel claim, because the state court's application of *Strickland* was neither contrary to federal law nor unreasonable in light of the evidence presented at the state court proceeding, Thorne also cannot prevail on this claim. Therefore, Thorne's federal habeas petition was properly denied.

I.

On September 15, 1999, Thorne was charged with hiring Joseph Wilkes to kill his ex-girlfriend, Yvonne Layne, the mother of his son, Brandon. Thorne was charged with one count of aggravated murder in violation of O.R.C. 2903.01. Thorne was also indicted for the specification that he committed murder for hire, in violation of O.R.C. 2929.04(A)(2).

Layne, a mother of five young children, was killed in her home during the night of March 31, 1999. The next day, Tawnia Layne, the victim's mother, went to Layne's home to take one of her grandchildren to school. When she arrived, she discovered her daughter's body. Layne's throat had been cut, and she was lying in a pool of blood. Layne's children were awake in the house. When police arrived, two partial bloody footprints were discovered at the scene. There was no other physical evidence present.

During the investigation, the police discovered that Layne had recently brought paternity proceedings against Thorne with respect to her son. The court ordered Thorne to pay child support in the amount of $358 per month with weekly payroll deductions beginning in March of 1999. At the time of his first payment, Thorne owed more than $700 in back support.

Wilkes became a suspect in the murder after Rose Mohr, a key witness, contacted the police to tell them that she and her boyfriend, Chris Campbell, had spoken with Wilkes at Carnation Mall on the night of the murder. Mohr told police that Wilkes said he was in town because he had been

2

hired to kill a woman. Wilkes showed Mohr and Campbell the knife that he had purchased at Walmart. Mohr remembered Wilkes saying that "some guy" hired him to commit the murder. Campbell, on the other hand, recalled Wilkes mentioning that his "girlfriend" had asked him to commit the murder and had paid for his room at the adjoining Comfort Inn.

In July of 1999, Wilkes confessed to the murder and implicated Thorne, stating that Thorne hired him to kill Layne. Wilkes provided details, including how Thorne's alibi was created and how Thorne planned the murder. Wilkes also stated that Thorne paid for the motel where Wilkes stayed the night after the murder, and also provided the money to purchase batting gloves and the knife used in the murder. As for Thorne's motive, Wilkes explained that Thorne wanted custody of his son, Brandon, and did not want to pay child support.

Wilkes testified that he rented a room at the Comfort Inn at Carnation Mall in Alliance, Ohio, on March 31, 1999. He then purchased batting gloves and a knife, walked to Layne's residence, and committed the murder. Wilkes told police that he threw the knife in a storm sewer near the crime scene, and disposed of the gloves in a McDonald's dumpster. The next morning, Thorne picked Wilkes up at the hotel and dropped him off at a friend's house. Behind the house in the woods Wilkes hid the nylon workout suit he wore during the murder.

During the investigation, Wilkes directed police to both the knife and the nylon workout suit. The knife and pants were tested for human blood, and a preliminary test showed the presence of human blood on the knife. However, further testing failed to return a positive test for human blood. No blood was found on the pants.

A jury found Thorne guilty of aggravated murder and of the specification that he conspired to commit murder for hire. At the sentencing hearing, the jury was unable to reach a verdict on the

death penalty. Under *State v. Springer*, 63 Ohio St.3d 167 (1992), the trial court declared a mistrial as to the sentencing phase of the trial and sentenced Thorne to life in prison without eligibility for parole.

In February of 2000, Thorne filed a motion for a new trial, which the trial court denied. A few months later, Thorne filed a direct appeal, arguing that the guilty verdict was not supported by the evidence and that he was denied his constitutional right to effective assistance of counsel. The Ohio Court of Appeals denied the appeal and affirmed the trial court's decision. Thorne then appealed to the Ohio Supreme Court, which dismissed the appeal as not involving a substantial constitutional question.

Prior to filing a direct appeal in the Supreme Court of Ohio, Thorne filed a postconviction petition in the state trial court. In January of 2001, Thorne amended his postconviction petition to include a *Brady* claim, which alleged that the State had failed to turn over the witness statement of George Hale. Hale told police that on the morning after the murder he observed a man, who did not meet the description of either Wilkes or Thorne, around Layne's house. After permitting the petition to be amended two more times, the trial court granted Thorne's request for an evidentiary hearing. A few months after the evidentiary hearing, the trial court denied Thorne's amended postconviction petition. On appeal, the Ohio Court of Appeals and the Supreme Court of Ohio affirmed the trial court's denial of Thorne's postconviction petition.

On April 13, 2006, Thorne filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After the government filed its response to Thorne's habeas petition, Thorne filed numerous motions requesting an extension of time in which to file his traverse. Thorne also requested leave to conduct additional discovery and filed a motion requesting that the government turn over

4

numerous documents in order to complete the record. R.15, Motion to Complete the Record. After a telephonic argument before the Magistrate Judge, the court ordered the government to provide certain postconviction relief hearing exhibits. R. 23, Order. Thorne was also provided the opportunity to conduct additional discovery.

On February 6, 2009, Thorne filed his traverse, which included, for the first time, the expanded *Brady* claim that additional exculpatory evidence was withheld from the defense. R. 48, Traverse, at 10-38. This additional evidence included: the fact that the police had shown George Hale a photo array including both Thorne and Wilkes, and that Hale still could not identify the man he had seen outside Layne's home the morning after the murder; the name and statement of Daniel Rogers, another witness who told police that on the day of the murder he had seen a man get out of a car, walk to Layne's door, feel around the door frame and enter the house, which Thorne argued cast doubt on Wilkes's story that he had walked from Carnation Mall to the house to commit the murder; a conversation between the detectives and a psychic in which, allegedly, the psychic put an "untenable story" as to how the murder was perpetrated "in the detectives' heads," and the detectives discussed rumors that Layne was involved with illegal drugs and the mob; the investigators' initial belief that Layne had been murdered near the sliding glass doors, not on the couch as Wilkes confessed; allegations of a relationship between Layne and a married police officer; the names of potential other suspects; and the statements of Layne's 4-year-old son, which allegedly mentioned that "mommy" was pushed down by "Jimmy," not Wilkes or Thorne. *Id.*

In his Report and Recommendation, the Magistrate Judge recommended that Thorne's habeas petition be denied on all grounds. With regard to Thorne's expanded *Brady* claim, the Magistrate Judge first summarized the volume of additional evidence presented by Thorne and separated this

evidence into "three classes": "(1) statements of witnesses who allegedly could have undermined the credibility of Wilkes' confession and testimony; (2) evidence that allegedly would have enabled the defense to challenge the thoroughness and reliability of the police investigation; and (3) evidence that allegedly would have enabled the defense to effectively impeach the prosecution's witnesses." R. 58, Report and Recommendation, at 24.

As for the first category, the Magistrate Judge examined the prosecution's failure to disclose the witness statements of George Hale and Daniel Rogers, who said that they saw an unidentified man near Layne's house around the time of the murder. The Magistrate Judge determined that, even if Hale had seen someone else near Layne's house the morning after the murder, the "fact that a third party may have been in the house between the commission of the murder and the time the police investigated the crimes does not change the fact that objective evidence corroborated Mr. Wilkes' confession." R. 58, Report and Recommendation at 27. Similarly, "all that Mr. Rogers can establish is that an unidentified male entered Ms. Layne's home at some undetermined time when she may or may not have been home." *Id.* Based on these assessments, the Magistrate Judge determined that the witness statements of George Hale and Daniel Rogers were neither exculpatory nor material, and thus, their nondisclosure did not constitute a *Brady* violation.

In examining the exculpatory value of these witness statements, the Magistrate Judge also discussed Wilkes's recantation of his confession. The Magistrate Judge stated that Wilkes's recantation did "not establish a reasonable probability of a different result, even considering the new evidence," because the Supreme Court has held that recanted testimony should be viewed with suspicion. *Id.* at 31 (citing *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984)). Because Wilkes's original confession would still be admissible as compelling impeachment evidence, and

an overwhelming amount of physical evidence corroborated Wilkes's original version of events, the Magistrate Judge believed that "a jury would not be likely to afford Mr. Wilkes's revised testimony sufficient weight to establish a reasonable probability of a different outcome." *Id.* at 32.

As for the second category of evidence that would have "enabled the defense to challenge the thoroughness and reliability of the police investigation," the Magistrate Judge discussed the following: (1) statements that the detectives initially believed Layne's throat was cut in front of the sliding glass doors, not on the couch as Wilkes confessed; (2) allegations that Wilkes's confession regarding how the murder was committed was "actually a baseless rumination proposed to [the police] by a 'psychic'"; (3) information about potential other suspects; and (4) statements by Layne's 4-year-old son, Vincent, that allegedly exonerated Wilkes and Thorne. *Id.* at 33-34. Again, the Magistrate Judge held that this withheld evidence "[fell] short of establishing a *Brady* violation meriting habeas relief because [the additional withheld evidence] fail[ed] to overcome the objective physical evidence that corroborated Mr. Wilkes' testimony at trial." *Id.* at 34. To the extent that this evidence contradicted Wilkes's testimony regarding the murder, the Magistrate Judge reasoned that any "alleged inconsistencies" could be explained by the fast-paced manner in which the murder occurred, Wilkes's drug use on the day of the crime, or Wilkes's failure to provide all of the facts in light of his concerns about receiving the death penalty. *Id.* at 35. In addition, the existence of other leads was not material to the investigation because, "under *Brady*, 'the prosecution is not responsible for providing a complete report to the defense of all police investigatory work,' including . . . other suspects." *Id.* at 36 (citing *Jackson v. Anderson*, 141 F. Supp. 2d 811, 831 (N.D. Ohio 2001)). Finally, as to the statements provided by Layne's 4-year-old son, the Magistrate Judge determined that this evidence did not impeach Wilkes's testimony as Thorne could not demonstrate

7

that the child was discussing the murder and not another event that had previously occurred. *Id.* at 38. Because all of this additional evidence was neither exculpatory nor material, the Magistrate Judge recommended that any *Brady* claim related to the second class of evidence be denied.

The Magistrate Judge also determined that the prosecution did not violate *Brady* by failing to disclose the third category of evidence, namely any "evidence that allegedly would have enabled the defense to effectively impeach the prosecution's witnesses." Here, the Magistrate Judge reviewed police reports suggesting that, according to Thorne, "[the police] provided Wilkes with the details of the crime scene" and allegations that a detective had "deceived" 18-year-old Wilkes into believing Thorne was in the next room. *Id.* at 34. To the extent that this evidence undermined the police officers' credibility or Wilkes's confession, the Magistrate Judge held that any evidence presented by Thorne to prove that the "police actively framed him" was "inconsistent with overwhelming evidence of record," and thus could not be considered exculpatory or material. *Id.* Further, the Magistrate Judge thought that it was "inconceivable that police could have planted the pants that were consistent with what Mr. Campbell and Ms. Mohr had seen Mr. Wilkes wearing the night of the murder, and that those pants would be covered with extensive mold growth." *Id.* at 41.

Finally, the Magistrate Judge noted that, even viewed cumulatively, none of the additional evidence proffered by Thorne could overcome the overwhelming physical evidence that corroborated Wilkes's confession. Therefore, the Magistrate Judge recommended that the district court reject all of Thorne's *Brady* claims. *Id.* at 44-45.

With regard to Thorne's ineffective assistance of counsel claim, the Magistrate Judge examined two sub-claims, only one of which is relevant for this appeal: that in light of the lack of physical evidence tying Wilkes to the crime scene, trial counsel was ineffective for not consulting

a forensic expert to examine blood patterns. *Id.* at 46. The Magistrate Judge recommended that the district court deny this claim because Thorne could not show prejudice "consider[ing] the amount of evidence corroborating Mr. Wilkes's claim that he committed the murder." *Id.* at 48.

The district court adopted the Magistrate Judge's report in full. With regard to the alleged *Brady* violations, the district court discussed all three categories of evidence together, holding that, even cumulatively, the additional evidence cited by Thorne in his traverse "fail[ed] to overcome" the physical evidence that corroborated Wilkes's testimony, including the fact that Wilkes could direct the police to a knife consistent with the murder weapon and to pants similar to those described by Mohr and Campbell. *Id.* at 10. The district court also agreed with the Magistrate Judge's assessment that there were "reasonable explanations for any minor discrepancies between Wilkes's testimony and what actually transpired during the murder, including the excitement of the situation, Wilkes's earlier drug use, and his incentive to avoid the death penalty." *Id.* Because the allegedly withheld evidence was not material for *Brady* purposes, the district court denied this ground for habeas relief.

As to the ineffective assistance of counsel claim, the district court determined that the outcome of Thorne's trial would not have been different had his counsel hired a forensic expert. *Id.* at 12. The district court noted that "at most, a forensic expert could help to determine the exact manner in which Layne was killed"; however, this "would not aid Thorne in demonstrating that another individual had killed Layne in the face of the overwhelming evidence to the contrary." *Id.* Because Thorne could not demonstrate that trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), this ground for habeas relief was also denied.

9

Thorne appeals, arguing that the district court erred by rejecting his expanded *Brady* claim, which related to exculpatory evidence that was only uncovered during the federal habeas proceeding. Thorne also claims that he was denied effective assistance of trial counsel because defense counsel failed to hire a forensic expert to determine whether the blood spatter at the crime scene corroborated Wilkes's confession.

II.

**A.      *Brady* Claim**

Thorne is unable to prevail on his habeas *Brady* claim because, although there is little doubt that the State withheld evidence, he cannot demonstrate that the evidence withheld was both exculpatory and material.  In addition to proving that the State withheld evidence, to demonstrate a *Brady* violation a defendant must show that: (1) "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching," *Stickler v. Greene*, 527 U.S. 263, 281-82 (1999); and (2) the evidence is material, so that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Thorne's many claims, even taken cumulatively, cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995).  Therefore, Thorne cannot prove a *Brady* violation occurred, and the district court did not err in denying his habeas petition.  In light of these conclusions, it is not necessary for us to determine whether Thorne procedurally defaulted his *Brady* claims, see *Wright v. Bell*, 619 F.3d 586, 593 n.1 (6th Cir. 2010), or whether the deferential standard of AEDPA applies.  *See Brown v. Smith*, 551 F.3d 424, 430 (6th

10

Cir. 2008); *see also Cullen v. Pinholster*, 131 S.Ct. 1388, 1418 (2011) (Sotomayor, J., dissenting) (internal citations omitted).

1.      The evidence related to George Hale's statements

Thorne's initial *Brady* claim concerned evidence that the State concealed the existence of an eyewitness, George Hale.  Hale told police that he saw a man who was not Wilkes exit Layne's home more than two hours before her body was discovered.  The Ohio Court of Appeals determined that this fact was not material in light of the "strong evidence" that Thorne had been involved in the murder, including Wilkes's confession.  *Id.* at 10.  However, on appeal Thorne points to additional evidence, only presented during the federal habeas proceeding, that Hale reviewed a photo array that included Thorne and Wilkes and did not identify either as the man he saw leaving Layne's house.

There was no *Brady* violation with regard to the withheld evidence relating to George Hale because this evidence was neither exculpatory nor material.  First, Hale's statement, and the newly-presented evidence surrounding this statement, was not exculpatory.  Exculpatory evidence includes "'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676 (internal citation omitted).  Exculpatory evidence also includes impeachment material.  *Id.* at 676.  In this case, the Magistrate Judge noted that the confusion surrounding Hale's testimony on direct and cross-examination at the postconviction evidentiary hearing undermines the exculpatory value of the testimony. R. 58, Report and Recommendation at 26.  Although Hale stated that he saw someone other than Wilkes in Layne's home prior to the discovery of the body, this assertion was undercut by Hale's testimony on cross-examination that he only saw a "guy *around* the house carrying some sort of garbage bag."

11

R. 8-69, PCR hearing, at 40 (emphasis added). It is unclear whether an individual was actually inside Layne's home prior to the police investigation, and thus this evidence does not directly support Thorne's innocence.

In addition, the evidence that Hale did not identify Thorne or Wilkes in a photo lineup is not exculpatory. First, the government's theory of the case was that Thorne hired another individual, Wilkes, to kill his ex-girlfriend; it is not inconsistent with this theory that an individual other than Thorne was seen at Layne's house. Second, as the Magistrate Judge noted, even if Hale had seen someone else near Layne's house the morning after the murder, the "fact that a third party may have been in the house between the commission of the murder and the time the police investigated the crimes does not change the fact that objective evidence corroborated Mr. Wilkes' confession." R. 58, Report and Recommendation at 27.

However, even if Thorne's defense counsel could have used Hale's direct testimony regarding the fact that a person other than Wilkes was in Layne's home prior to the police investigation, *id.* at 26, Thorne is not able to demonstrate that this evidence was material. For evidence to be material, the petitioner has to show that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434-35. We are required to consider *Brady* evidence collectively, *id*. at 436; however, even when the evidence related to Hale is considered with Thorne's other newly-presented claims, it does not undermine confidence in the jury's verdict. Hale could not definitively state that there was someone else in the house prior to Layne's body being discovered. In addition, the state court correctly noted that there was a "significant gap" between the time Hale saw the unknown man and the estimated time of Layne's death. R. 8-20, Ex. 22, Ohio Court of Appeals Decision, at 10.

12

Officers contacted Hale several other times in the continuing months and asked him for further details about what he witnessed, even taking him to a hypnotist in an effort to recover any details he forgot. Hale, however, was unable to recall anything more than he told officers on April 1.

Thorne also does little to explain how the evidence was material or would sufficiently undermine confidence in his guilty verdict. The only explanation Thorne gives is that as a result of the suppressed evidence, Thorne's trial attorneys "wavered between multiple theories of defense." However, "[m]ateriality pertains to the issue of guilt or innocence, and not the defendant's ability to prepare for trial." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994). Even if the defense would have utilized different tactics if the suppressed evidence had been known, this is not enough to prove materiality. The defense's chosen strategy at trial—to create doubt regarding Thorne's association with Wilkes, not to raise doubts regarding Wilkes's guilt—might still have been the best one in light of the overwhelming physical evidence corroborating Wilkes's initial confession implicating Thorne.

Even if the evidence were favorable to Thorne, the district court was correct in finding that the suppressed evidence did little to undermine confidence in the jury's verdict due to the overwhelming physical evidence that corroborated Wilkes's confession. Although Wilkes later recanted his confession, the confession was still admissible as compelling impeachment testimony and was corroborated by the physical evidence in this case, as the Magistrate Judge noted. R. 58, Report and Recommendation at 31-32. To the extent that any newly-presented evidence casts doubt on Wilkes's confession, this doubt is easily overshadowed by the fact that Wilkes led the police to a knife in a sewer drain that was consistent with the murder weapon. Wilkes also told the police where they could find the nylon workout suit that two witnesses say he was wearing on the night of

13

the murder. Thorne has done little to undercut the presumption of correctness owed the state court's finding on these factual matters. R.8, Answer at Ex. 22, at 9; *see* 28 U.S.C. § 2254(e)(1) (stating that "a determination of a factual issue made by a State court shall be presumed to be correct" and that the "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"). There were also a number of telephone calls between Wilkes and Thorne during the days surrounding the murder, R.8, Trial Transcript, Ex. 52 at 1146-1165, and motel receipts corroborate the fact that Wilkes, who had no money prior to the murder, presented a $100 bill to pay for the Comfort Inn motel room. R. 8, Trial Transcript, Ex. 51 at 1137-1140. The State also presented David Thorne's time cards to show that he left work during the middle of the day on the day after the murder, corroborating Wilkes's confession that Thorne picked him up at the motel. R.8, Trial Transcript, Ex. 56 at 1354-55.

The jury believed this evidence and convicted Thorne of aggravated murder. There was no *Brady* violation as there is little to suggest that Hale's statements and any related evidence would have undermined this finding or that the result would have been different in a new trial.

2. Evidence related to detectives' initial conclusions regarding how the attack was perpetrated

Thorne also claims that the suppressed evidence regarding the detectives' initial conclusions about how the attack was perpetrated undermines Wilkes's confession. According to the events as described by Thorne, the detectives originally believed that Layne's throat had been "slashed in front of the sliding glass doors," and that she was "drug out of the way of the window," contradicting Wilkes's statement that he killed Layne on the couch. Evidence withheld related to these original conclusions was neither exculpatory nor material. The detectives' initial assumptions regarding the

14

attack, even if they do contradict Wilkes's confession, are not necessarily favorable for Thorne. As it is common for different theories to be presented during a police investigation, evidence of the police's uncertainty regarding exactly how the murder occurred does little to suggest that Thorne was innocent. In addition, as discussed by the Magistrate Judge, numerous reasons exist for any alleged inconsistencies between the detective's assumptions and Wilkes's confession, including the fact that the murder occurred quickly, Wilkes used drugs on the day of the crime, and Wilkes may have purposefully omitted some facts surrounding the murder to avoid the death penalty. R.58, Report and Recommendation, at 35.

The evidence related to the detective's initial assumptions is also not material, as it does not undermine confidence in the jury's verdict for many of the reasons discussed above; in light of Wilkes's confession, the knife in the sewer drain, and the testimony of other witnesses, there is not a reasonable probability that knowing the detectives' initial impressions would have led a jury to reach a different verdict in this case.

    3.      The other *Brady* sub-claims

The government argues that by discussing only two *Brady* sub-claims in his initial appellate brief—the statements related to George Hale and the detectives' initial conclusions—Thorne waived all other claims that were argued in the district court. *See Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995). While it is true that it is difficult to ascertain the additional *Brady* claims that Thorne made below, as he does not extensively address them on appeal, these claims can also easily be disposed of on the merits. To the extent that Thorne refers to any additional *Brady* claims on appeal, these can be summarized as follows: (1) evidence that undermines the credibility of the

15

police, including the claim that detectives allegedly visited a psychic and told her that Layne had a personal relationship with a married police officer and was involved with illegal drugs and the mob; (2) evidence related to other persons of interest, including statements by Daniel Rogers, a witness who saw a man enter Layne's home prior to the murder; and (3) statements made by Layne's 4-year-old son that a man named "Jimmy" pushed "mommy," potentially exonerating Wilkes and Thorne.

Thorne cannot prove that this newly-presented evidence was exculpatory and material. Of course, this evidence must be viewed cumulatively. *Kyles*, 514 U.S. at 436. However, even considered cumulatively with the evidence already discussed, *supra* II.A.1, 2, this newly-presented evidence does not undermine the jury's guilty verdict.

First, Thorne has not shown how statements made by the police during the "psychic interview," or allegations that Layne was involved with drugs or the mob, would have undermined Wilkes's confession and thus altered the outcome of Thorne's case. Thorne simply discusses Layne's alleged "mob" and "drug" connections without stating how this led to Layne's murder. In addition, though Thorne raises the specter of impropriety with rumors of a relationship between Layne and a married member of the police force, he does not explain how this either influenced the investigation or undermined the physical evidence corroborating Wilkes's confession. This court has held that mere speculation "is insufficient to establish a *Brady* violation." *Henness v. Bagley*, 644 F.3d 308, 325 (6th Cir. 2011) (citing *Wood v. Bartholomew*, 516 U.S. 1, 6-8 (1995)).

Second, Thorne cannot prove that the evidence related to other suspects was either exculpatory or material. The fact that other people were considered suspects does not mean that, after ruling these individuals out, the detectives' case was any weaker against Wilkes and Thorne. This court has held that information about other suspects that "does not even indirectly link any of

16

the suspects to the murder" is "simply too remote to have been exculpatory or to undermine confidence in the verdict." *Apanovitch v. Houk*, 466 F.3d 460, 484 (6th Cir. 2006). In addition, the fact that another eyewitness, Daniel Rogers, saw a man enter Layne's home prior to the discovery of the body is not exculpatory for Thorne. As the Magistrate Judge discussed, all that Daniel Rogers's statement proves is that "an unidentified male entered Ms. Layne's home at some undetermined time when she may or may not have been home." R.58, Report and Recommendation at 27. To be considered material in a *Brady* analysis, there must be "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." *Spirko v. Anderson*, No. 3:95CV7209, 2000 WL 1278383, at *7 (N.D. Ohio July 11, 2000); *see Jalowiec v. Bradshaw*, 657 F.3d 293, 312 (6th Cir. 2011). Speculation, which is all that Thorne provides, is not enough. *Bagley*, 644 F.3d at 325.

Third, it is unlikely that the statements of Layne's young son would have undermined confidence in the jury's verdict. In this instance, it is difficult to determine what weight the jury would have placed on the statements of a 4-year-old, especially when those statements contradicted the physical evidence. As the Magistrate Judge noted, Thorne also could not demonstrate that the child was discussing the murder, not another event that had previously occurred. R.58, Report and Recommendation, at 38.

Because Thorne cannot demonstrate that the evidence withheld, even considered cumulatively, was both exculpatory and material, Thorne is unable to prove a *Brady* violation and the district court correctly denied his habeas petition on this ground.

**B.      Ineffective Assistance of Counsel**

Because the state court's application of *Strickland* was neither contrary to federal law nor unreasonable in light of the evidence presented at the state court proceeding, Thorne cannot prevail on his claim of ineffective assistance of counsel.  Thorne's ineffective assistance of counsel claim was fully addressed by the state court, R. 8-20, Ex. 22, Ohio Court of Appeals Decision, at 18-20, and thus clearly warrants the deference required by AEDPA .  Under  28 U.S.C. § 2254(d) the last reasoned opinion from a state court  must be granted a high degree of deference.  *See Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).  To prevail under § 2254(d), Thorne must prove that the Ohio Court of Appeals  decision was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  This "high threshold" requires a federal court to "ask whether it is possible [for] fairminded jurists [to] disagree that those [state court opinions] are inconsistent with the holding in a prior decision of [the Supreme] Court." *Pinholster*, 131 S.Ct. at 1402 (citing *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)).  The standard is "doubly deferential" when AEDPA is applied with *Strickland*.  *Pinholster*, 131 S.Ct. at 1410; *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  The "question under § 2254(d) is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S.Ct. at 778.   In this case, the Ohio Court of Appeals reasonably concluded that Thorne's counsel was satisfactory under the parameters put forth in *Strickland*.

Thorne has not met the first prong of *Strickland,* which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

18

Sixth Amendment." *Strickland*, 466 U.S. at 687. On appeal, Thorne argues that trial counsel provided ineffective assistance of counsel by failing to obtain a forensic expert to examine the blood patterns at the crime scene. In determining that trial counsel was not deficient, the state court concluded that the defense counsel made a strategic decision to focus on Thorne's involvement rather than Wilkes's guilt. R. 8-20, Ex. 22, Ohio Court of Appeals Decision, at 19. The state court reasoned that the decision not to hire a forensic expert was tactical, because such an expert could have uncovered evidence that would have been damaging to Thorne. *Id.* In reaching this determination, the state court properly applied *Strickland*, which demands that defense counsel's strategic choices be "[g]iven [a] high level of deference," *Davis v. Lafler*, 658 F.3d 525, 538 (6th Cir. 2011), and petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. In addition, the state court's decision cannot be said to be "contrary to" federal law and Supreme Court precedent because the Supreme Court recently held in *Harrington*, 131 S.Ct. at 788-90, that a defense counsel was not ineffective for failing to consult a blood evidence expert to analyze a pool of blood at a crime scene in a case in which the victim's blood pattern was a "central concern" of the trial. Because Thorne has presented nothing beyond conjecture to undermine the state court's finding that the tactic chosen by the defense counsel was reasonable, Thorne's claim fails under the first prong of *Strickland*.

Thorne also cannot prove prejudice under the second prong of *Strickland*, which requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Thorne speculates that if counsel had consulted a blood pattern expert, it would have been possible to prove that Layne's throat had been

slit in front of the sliding glass doors, undermining Wilkes's confession that he murdered Layne while sitting on the couch. By raising doubts as to Wilkes's credibility, Thorne argues that it may have been possible to imply that Wilkes's testimony implicating Thorne was also fabricated. However, it is unlikely that defense counsel could have created sufficient doubt regarding the mechanics of the murder to undermine the jury's confidence in Wilkes's confession in light of the overwhelming physical evidence that corroborated his testimony. Even with Wilkes's recantation of his confession, it would have been nearly impossible for the defense to explain the numerous calls between Wilkes and Thorne in the days surrounding the murder, as well as how Wilkes was able to lead the police to a knife that was consistent with the murder weapon. To the extent discrepancies exist between Wilkes's confession and any alleged evidence that the murder transpired in a different way, this can be easily explained, in the words of the district court, by the "excitement of the situation, Wilkes's earlier drug use, and his incentive to avoid the death penalty." R. 64, Opinion and Order, at 10. Therefore, Thorne has not proven prejudice or a "reasonable probability" that the outcome of his case would have been different if he had consulted a forensic expert.

Because Thorne has not proven either that counsel was deficient or that this alleged deficiency resulted in the guilty verdict, the district court properly denied Thorne's ineffective assistance of counsel claim.

III.

For the foregoing reasons, we affirm the district court's denial of Thorne's habeas petition.

20